UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

DR. ERIC STEFFEN,                                  Case No. 20-CV-2281 (PJS/JFD)

            Plaintiff/Counterdefendant,

v.                                                            ORDER

NORTHWAY RESOURCE
DEVELOPMENT, LLC,

            Defendant/Counterclaimant.

> Joseph M. Windler and Christina Rieck Loukas, WINTHROP &
> WEINSTINE, P.A., for plaintiff/counterdefendant.
>
> Todd Wind and Pari I. McGarraugh, FREDRIKSON & BYRON, P.A., for
> defendant/counterclaimant.

Defendant Northway Resource Development, LLC ("Northway"), is a real-estate holding company, one of four companies associated with an ophthalmology practice. Plaintiff Dr. Eric Steffen is a physician, a former employee of the practice, and a former member of Northway. Steffen left the practice in 2018. The parting was acrimonious, and Steffen and his former colleagues have been involved in continuing litigation—both before a Minnesota state court, *see* ECF No. 12 at 14 ¶ 10, and before this Court—over all manner of issues stemming from Steffen's departure.

Some of the issues in dispute—the ones that are the subject of this lawsuit—relate to Northway's buyback of Steffen's membership interest in the

company.  The parties agree that Northway has properly exercised its right to buy back Steffen's membership interest, *see id.* at 13 ¶ 6, but the parties disagree about how to assess the value of that interest.  The parties' disagreement centers on three issues: First, the parties disagree about the "valuation date"—that is, as of which date the value of Steffen's membership interest should be assessed.  Second, the parties disagree about the "effective date"—that is, the date on which the transfer of Steffen's membership interest will be effective.  And third, the parties disagree about whether Northway has breached a contract and thereby forfeited its appraisal rights.

Both Steffen and Northway have moved for summary judgment.  For the reasons that follow, the Court agrees with Steffen regarding the effective date and finds that genuine disputes of material fact preclude summary judgment regarding the valuation date and the forfeiture issue.

## I.  BACKGROUND

As noted, Northway is a real-estate holding company affiliated with a professional ophthalmology practice.  ECF No. 12 at 12 ¶¶ 2, 3.[1]  The other companies affiliated with the practice are St. Paul Eye Clinic, P.A. (the "Eye Clinic"), St. Paul Opticians, Inc. ("Opticians"), and Eye Surgery Associates, Inc. ("Eye Surgery").  *Id.* at 12

---

[1]Page numbers in record citations refer to the pagination in the computer-generated banner superimposed on items docketed in ECF, not to any form of pagination internal to the documents.

¶ 3.  Northway holds a 50% interest in a building in Woodbury, Minnesota (the "Woodlake building"), in which the Eye Clinic has its primary offices.  *Id.* at 12 ¶ 2.  Northway previously held a 79.2% interest in Beam Building Associates, which owned the Beam Professional Building in Maplewood, Minnesota (the "Beam building").  Beam Building Associates sold the Beam building in December 2018, *id.*, and Northway received about $4.73 million in net proceeds from the sale, ECF No. 37 at 2.

Steffen was employed by the practice from 2004 to 2008.  *Id.* at 13 ¶ 4.  Effective January 1, 2008, Steffen became a member of the practice by purchasing shares in the Eye Clinic and Eye Surgery and membership units in Northway.  *Id.*  In 2013, when Opticians spun off from the Eye Clinic into its own entity, Steffen became a shareholder in Opticians.  *Id.*  As part of his buy-in to the practice, Steffen executed Stock Sale and Redemption Agreements (the "Redemption Agreements") for the Eye Clinic and Eye Surgery and a Membership Unit Sale Agreement for Northway.  *Id.* at 13 ¶ 5.  By signing the Membership Unit Sale Agreement, Steffen entered into and became a party to Northway's Member Control Agreement ("MCA").  *Id.*; ECF No. 36-1 at 4.

In roughly April 2018, Steffen gave notice that he intended to resign his employment with the Eye Clinic.  ECF No. 12 at 14 ¶ 8.  He saw patients through June 8, 2018, and then ended his employment on August 5, 2018.  *Id.*  Under the MCA, a Northway member's termination of employment with the Eye Clinic is an "Option

Event" that triggers procedures for Northway to buy back that member's interest. *See* ECF No. 5-1 at 4, 13. Northway exercised its repurchase option on September 4, 2018. ECF No. 12 at 13 ¶ 6. One of the things triggered by Northway's exercise of its repurchase option was a process to determine the value of Steffen's membership interest. ECF No. 5-1 at 13.

The valuation process described in the MCA is as follows: If the parties agree on a purchase price, then the process ends. *Id.* If the parties do not agree, then they try to agree on a mutually acceptable appraiser to determine the value of the interest. *Id.* If the parties cannot agree on an appraiser, then they each select an independent appraiser, and each conducts an appraisal. *Id.* If the two appraisals are sufficiently close, then the average of the two appraisals becomes the purchase price; if not, then the two appraisers pick a third appraiser to do another appraisal. *Id.* The average of the two closest appraisals then becomes the purchase price. *Id.*

As noted, the parties dispute three issues relating to the valuation of Steffen's membership interest. The first dispute concerns the valuation date. The MCA calls for the value of Steffen's membership interest to be appraised, but the MCA does not identify as of which date. Steffen argues that his interest should be valued as of August 5, 2018, the date of his termination from the practice. ECF No. 41 at 5. Northway

-4-

disagrees, arguing that Steffen's interest should be valued as of December 31, 2018.  ECF

No. 30 at 13.

The reason the valuation date matters is that, on August 5, 2018, Beam Building

Associates still owned the Beam building, but by December 31, 2018, it had sold the

building.  Steffen believes that Beam Building Associates—and, consequently,

Northway—got a bad deal; specifically, Steffen complains that, in connection with the

sale of the Beam building, Northway "prepaid rent that was not its obligation, paid for

future tenant improvements that were not its obligation, made lump-sum payments on

another buy-out and loan rather than making those payments over time, and otherwise

deducted dollar amounts out of the purchase price."  ECF No. 41 at 4.  Thus, Steffen

believes that his membership interest was worth more on August 5, 2018 (before

Northway got a bad deal for the Beam building), than on December 31, 2018 (after

Northway got a bad deal for the Beam building).  *Id.* at 4–5; *see also* ECF No. 6 at 4 ¶ 24.

The parties' second dispute concerns the date on which the transfer of Steffen's

membership interest will be effective.  Steffen says that, under the MCA, the effective

date of the transfer is the date of closing.  ECF No. 41 at 9.  But Northway contends that,

based on historical practice, the effective date occurs prior to the closing of the

transaction, "generally coinciding with the year-end valuation date or the end of the

member's [Eye Clinic] employment."  ECF No. 30 at 11.  The reason why this matters is

complicated; basically, each party fears negative financial consequences if the other party is correct about the effective date.[2]

The parties' third and final dispute relates to whether Northway has breached the MCA and, if so, whether Northway has thereby forfeited its appraisal rights. Steffen asks the Court to find Northway in breach of the MCA because it has neither completed an independent appraisal nor repurchased his interest within what he says are the MCA's required time frames. ECF No. 41 at 9–12. According to Steffen, because Northway "has refused to appoint an independent appraiser," Northway has "forfeited its right to conduct such an appraisal." ECF No. 5 at 6–7 ¶ 36. Thus, says Steffen, his membership interest must be "valued by using the valuation completed by his independent appraiser." ECF No. 41 at 18. Northway disagrees, arguing that, until the

---

[2]Steffen is concerned that an effective date of December 31, 2018, would make him recognize income in 2018 despite not receiving that income until years later, leading to late fees, penalties, and additional taxes by the IRS on "effectively an interest-free, [multi]year loan" to Northway. ECF No. 41 at 17. At oral argument, Northway contended that making the effective date the closing date and setting the valuation date as August 5, 2018, would let Steffen double-dip: He would get the full value of the Beam building from before its sale, and then, because he would have financial rights as a dissociated member until the closing date, he would also get the full value of the proceeds of the sale. Steffen countered at oral argument that, based on certain issues already decided in the state-court proceeding, he would *not* be entitled to a distribution of the sale proceeds (that is, to a second "dip"); he further represented that, in any case, he does not seek double recovery on the Beam building's sale. The Court expresses no opinion on these matters.

dispute over the valuation date is resolved, Northway cannot hire an appraiser, because it cannot tell an appraiser what he or she is supposed to appraise. *See* ECF No. 30 at 18.

Each party now moves for summary judgment.

## II.  ANALYSIS

### A.  Legal Framework

#### 1.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255.

#### 2.  Minnesota Law on Interpreting Contracts

In Minnesota, "the primary goal of contract interpretation is to determine and enforce the intent of the parties." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003).  If "the parties express their intent in unambiguous

words," then a court must give the words "their plain and ordinary meaning" in accordance with the contract's obvious overall purpose. *Id.* at 323–24.

Both determining whether a contract is ambiguous and interpreting an unambiguous contract are issues of law for the court. *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018). A contract term is ambiguous if it is "susceptible to more than one reasonable interpretation." *Id.* Once a court determines that a term is ambiguous, the court may admit extrinsic evidence of the parties' intent. *Id.* At that point, however, the interpretation of the ambiguous term typically "becomes a question of fact for the jury." *Id.*

Minnesota has also adopted the following canon of interpretation, which is relevant in this case:

> [I]nstruments executed at the same time, for the same purpose, and in the course of the same transaction are, in the eyes of the law, one instrument and will be read and construed together unless the parties stipulate otherwise. . . . [T]hey will be read together and each will be construed with reference to the others, although the instruments do not in terms refer to each other.

*Marso v. Mankato Clinic, Ltd.*, 153 N.W.2d 281, 288–89 (Minn. 1967). Whether the court reads the multiple instruments as one "'is governed by the intent of the parties manifested at the time of contracting and viewed in light of the surrounding circumstances' and is not contingent on a finding of ambiguity." *Roemhildt v. Kristall*

-8-

*Dev., Inc.*, 798 N.W.2d 371, 373 (Minn. Ct. App. 2011) (quoting *Farrell v. Johnson*,

442 N.W.2d 805, 807 (Minn. Ct. App. 1989)).

## B. The Effective Date

The Court turns first to the effective date of Northway's buyout of Steffen.

Steffen says that the buyout's effective date is the same as the buyout's closing date

(which, of course, has not yet occurred), ECF No. 41 at 9, while Northway says that the

effective date is December 31, 2018 (which is the end of the calendar year during which

Steffen left the practice), ECF No. 30 at 14.

The MCA does not expressly define the "effective date" of a buyback stemming

from the termination of a member's employment.[3]  Two sections of the MCA are

relevant, though.  Section 7.2 provides that:

> In the event a Qualified Member terminates his or her
> employment, the interest of the Member . . . shall be
> redeemed by the Company and/or the remaining Members
> in the following manner:
>
> [Subsections (a) and (b) concern termination by reason of
> retirement and death, respectively.]
>
> (c)     Upon termination of employment for any other
>          reason, the interest of the member . . . may be
>          purchased at any time up to three (3) years after the

---

[3]Section 6.6 of the MCA does define the effective date of certain transfers of
membership interests.  ECF No. 5-1 at 11.  Neither party discusses this section, though,
so neither party seems to interpret it to apply to a buyback resulting from a termination
of employment.

termination of employment.  If the interest is not
purchased prior to the third anniversary of the date of
employment [sic], it shall be purchased by the
Company and/or the remaining Members at that time.

(d)     The purchase price and terms of payment shall be in
accordance with the following Section 8.

ECF No. 5-1 at 12.  And Section 8.4 provides that:

The purchase and sale of any Membership Interest . . . shall
be consummated within thirty (30) days after the later of the
date the price is determined or the relevant option was
exercised . . . . At such closing, the selling party shall deliver
such instruments of conveyance as would be reasonably be
[sic] required to vest title to the Membership Interest . . . in
the purchasing party and the purchasing party shall pay the
purchase price thereof . . . .

*Id.* at 15.

Under the unambiguous language of the MCA, the effective date is the closing

date.  Section 8.4 provides that, *at the closing*, the purchaser will exchange cash for the

seller's "instruments of conveyance," which will "vest title to the Membership Interest."

*Id.*  Until the closing, title in the interest will not vest in Northway, and afterward,

Northway will have the instruments of conveyance vesting that title in itself.  Likewise,

prior to the closing, Steffen will not be paid the purchase price, and after the closing, he

will have his money.  In other words, the sale will be effective—title will be exchanged

for money—simultaneously with the closing.  The effective date *is* the closing date.

-10-

Minnesota law on transfers of membership interests in LLCs confirms this understanding. "A transferable interest may be evidenced by a certificate of the interest . . . , and, subject to this section, the interest represented by the certificate may be transferred by a transfer of the certificate." Minn. Stat. § 322C.0502, subdiv. 4. Moreover, an LLC "need not give effect to a transferee's rights . . . until the company has notice of the transfer." *Id.* § 322C.0502, subdiv. 5. In other words, the statute contemplates that the transfer takes effect upon the delivery of the conveyance instrument or (at the option of the LLC) upon notice of that delivery to the LLC. In the case of a buyback, however, these events would occur simultaneously at the closing. Northway has pointed to no language in the MCA or elsewhere suggesting that the delivery of Steffen's instrument conveying his membership interest will have any different effect. *Cf. Cummings v. Newell*, 90 N.W. 311, 312 (Minn. 1902) ("It is true, as a general proposition, that a deed does not take effect until its delivery, but this applies generally where, from the very nature of the sale, the delivery is an essential part of the same.").

Northway resists the unambiguous text of the MCA and argues that the Court should interpret that text in conjunction with the other contracts that Steffen executed in order to buy into the practice because they were all "part of the same transaction." ECF No. 30 at 13. Those agreements are the Redemption Agreements for the Eye Clinic, ECF

No. 36-1 at 44–61; Eye Surgery, *id.* at 63–78; and Opticians, *id.* at 80–94.  Steffen admitted at the trial of the state-court action that he signed these agreements "as part of the same transaction" and "at or about the same time."  *Id.* at 42.[4]

As an initial matter, the Court cannot consider the Opticians agreement in construing the MCA under the simultaneous-execution rule.  The copy of the Opticians agreement that Northway cites has an effective date of October 1, 2013—years after Steffen bought into the practice—and no apparent execution date.  *See id.* at 80, 92.  In fact, Opticians did not even exist as its own entity at the time that Steffen bought into the practice.  ECF No. 12 at 13 ¶ 4.

There is some merit to the argument that the MCA should be interpreted in conjunction with the Eye Clinic and Eye Surgery agreements.  The parties have stipulated that the three agreements were signed at roughly the same time, and the agreements were all part of the same transaction.  *See id.* at 13 ¶ 5; *Marso*, 153 N.W.2d at 288–89; *Roemhildt*, 798 N.W.2d at 373.  Nevertheless, applying the simultaneous-execution rule here does little to aid Northway, because there are significant differences among the relevant provisions of the three agreements, and thus there is no reason to

_____

[4]Northway conceded at oral argument that it was not clear from the transcript whether Steffen's testimony referred to just the Redemption Agreements or to the MCA as well.  But the parties previously stipulated that Steffen executed the Redemption Agreements for the Eye Clinic and Eye Surgery "[a]t or about the same time" as he entered into the Northway MCA.  ECF No. 12 at 13 ¶ 5.

conclude that the three agreements prescribe the same effective date following the termination of a shareholder's employment.

Under the Eye Clinic agreement, the effective date is defined by what the Court will call a "trigger date," the determination of which is governed by a complicated and seemingly contradictory set of provisions.[5]  If this trigger date falls between July 1 and December 31, then the effective date is December 31 of the same year as the trigger date;

---

[5]Northway interprets the trigger date to be the date that employment is terminated.  *See* ECF No. 30 at 4.  But that does not comport with the agreement's text.  The agreement defines *two* potential trigger dates if employment is terminated.  One is the date that employment is terminated, and the other is the date an "offer to sell is made or deemed to be made" (the "offer date").  ECF No. 36-1 at 47 (paragraph 1.3(b)).  And the agreement defines the offer date for a termination in two different ways:  One is the termination date, *id.* at 46 (paragraphs 1.2(a), 1.2(a)(7)), and the other is *30 days after* the termination date, *id.* at 50 (paragraph 2(a)).  Of course, these different trigger dates will generally yield the same effective date for a termination (unless the employee leaves in June).

That's not all—there may be *another* trigger date.  The agreement provides that, "[i]f a deemed offer *must be accepted* by the Company," then the trigger date is the date the offer is accepted.  *Id.* at 47 (emphasis added) (paragraph 1.3(b)).  And, indeed, following an offer, "Eye Clinic *shall* purchase all of the offered Shares on the terms of sale set forth in Paragraph 1.3."  *Id.* at 46 (emphasis added) (paragraph 1.2(b)).  But it is not clear whether "shall" means "must" in the case of a termination; the agreement also seems to make such a purchase optional.  *Id.* at 51 (paragraph 2(a)) ("A deemed offer by reason of not being a full time employee once made shall be a continuing offer which the Board of Directors by a vote of 80% of the members of the Board of Directors may exercise at any time.").

Fortunately, the Court does not need to untangle this mess.  It suffices to say that the only thing unambiguous about the effective date of the Eye Clinic agreement is that it is December 31 of *some* year.

and if the trigger date falls between January 1 and June 30, then the effective date is December 31 of the year *before* the trigger date.  *See* ECF No. 36-1 at 47.

The Eye Surgery agreement differs in two ways.  One is the trigger date:  It is always 30 days after employment ends.[6]  The second difference is the cutoff for using the preceding year's or the current year's December 31.  If the trigger date is between *April* 1 (rather than July 1) and December 31, then the effective date is December 31 of the same year as the trigger date; and if the trigger date is between January 1 and March 31, then the effective date is December 31 of the year before the trigger date.  *Id.* at 66 (paragraph 1.3(b)).

In short, there are significant differences with respect to how these two agreements set their effective dates.  Both provide that the effective date is on December 31 of *some* year, but the procedure for calculating *which* year is different (and is hopelessly ill-defined in the Eye Clinic agreement).  By contrast, the MCA unambiguously sets the buyback's effective date as the date of closing.  Therefore, any similarities between the MCA and the other two agreements do not change the Court's interpretation of the MCA.

---

[6]Paragraphs 1.2(a) and 1.2(a)(5) provide that "[t]he employee shall be deemed to have made an offer to sell upon the encumbrance or other transfer or disposition including, but not limited to . . . [u]pon termination of full-time employment with [the Eye Clinic], as set forth below in Paragraph 2."  ECF No. 36-1 at 64–65.  Paragraph 2 then unambiguously sets the trigger date at 30 days following termination.  *Id.* at 68.

-14-

*C.  The Valuation Date*

The parties also dispute the date as of which Steffen's membership interest in Northway should be valued.  Steffen argues that the MCA is clear and sets the valuation date as the date on which his employment ended (August 5, 2018).  ECF No. 41 at 7.  Northway argues that the MCA is ambiguous but that the extrinsic evidence is clear that the valuation date is December 31, 2018.  ECF No. 30 at 14.  The Court finds the MCA to be ambiguous and the extrinsic evidence to be insufficient to permit the Court to decide the valuation date as a matter of law.

Section 8.2 of the MCA sets the procedure for determining the purchase price for a terminated member's interest:

> Upon the occurrence of an Option Event,[7] the purchase prices for the Offered Units and the terms of payment shall be determined as follows:
>
> (a)    The transferors and the transferees (the "parties") shall agree on the purchase price within five (5) business days of the exercise of the purchase option . . . .
>
> (b)    If the parties cannot agree on the purchase price then the purchase price shall be determined by an appraisal. . . .

---

[7]Termination of a member's employment is an Option Event.  ECF No. 5-1 at 4 (paragraph 1.20(ii)).

(c)     The parties shall mutually agree on an independent qualified business appraiser within ten (10) business days of the exercise of the option.

(d)     If the parties cannot agree on an independent appraiser, then the transferors as a group and the transferees as a group shall each select an independent appraiser who shall perform appraisals. If the appraised prices are within ten percent (10%) of each other then the purchase price shall be the average of the appraisals. If the appraisal prices differ by more than ten percent (10%), then the appraisers shall select a third appraiser who shall perform an appraisal and the purchase price shall be the average of the two closest appraisals.

ECF No. 5-1 at 13.

### 1. Ambiguity in the Text

The MCA is ambiguous as to the valuation date. The MCA merely directs the parties to select appraisers; it does not tell the appraisers as of what date to value Steffen's interest. In fact, it would be reasonable to interpret the contract as being completely silent regarding the valuation date, raising the possibility that the parties had no meeting of the minds regarding the issue.[8]

---

[8]If this turns out to be the case, the MCA would not be void. Minnesota follows the rule of the Restatement (Second) of Contracts § 204: "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." *See, e.g., Ed Cave & Sons, Inc. v. City of Two Harbors*, No. A08-1888, 2009 WL 2998001, at *4 (Minn. Ct. App. Sept. 17, 2009); *TNT Props., Ltd. v. Tri-Star Devs. LLC*, 677 N.W.2d 94, 101 (Minn. Ct. App. 2004).

Steffen contends that the MCA "unambiguously establishes" that the valuation date is the date of the Option Event—in this case, his termination.  ECF No. 41 at 7.  The language to which he points is at the very beginning of Section 8.2:  "*Upon the occurrence of an Option Event, the purchase prices* for the Offered Units and the terms of payment *shall be determined* as follows."  *Id.* (quoting ECF No. 5-1 at 13).  Steffen reads "upon" to mean "on" and "occurrence" to mean "event or incident."  *Id.*  Thus, he concludes, "it is 'on' the 'event,'—here the voluntary termination occurring on August 5, 2018—that the 'purchase prices . . . and the terms of payment shall be determined.'"  *Id.* (alteration in original) (quoting ECF No. 5-1 at 13).

That reading cannot be correct.  That an appraiser determines a price *on* August 5, 2018, means that the appraiser *does his work* on August 5, 2018.  But the parties are not disputing when the appraisers should *do their work*.  Rather, they dispute *as of when* Steffen's interest should be valued.  An appraiser could sit down at his desk on August 5, 2018, and appraise the value of Steffen's interest *as of* December 31, 2017—or *as of* any other date.  "Upon" is not synonymous with "as of."

In any event, the language in Section 8.2 cited by Steffen does not even mean that the appraisers must do their work on the day of the "Option Event" (here, the "Option Event" being the termination of Steffen's employment).  Section 8.2 must be read together with Section 7.2.  Section 7.2(c) provides:

-17-

>> *In the event a Qualified Member terminates his or her employment*, the interest of the Member . . . shall be redeemed by the Company and/or the remaining Members in the following manner:
>>
>> . . .
>>
>> (c)   *Upon termination of employment* . . . the interest of the member . . . may be purchased at any time up to three (3) years after the termination of employment. . . .
>>
>> (d)   The purchase price and terms of payment shall be in accordance with the following Section 8.

ECF No. 5-1 at 12 (emphases added).  Section 8.2 then provides:

>> *Upon the occurrence of an Option Event*, the purchase prices for the Offered Units and the terms of payment shall be determined as follows . . . .

*Id.* at 13 (emphasis added).

In sum, when the "Option Event" is the termination of a member's employment (as is true here), Northway gets three years to decide whether to exercise its option to purchase the member's interest.  If Northway exercises its option, the parties have up to five business days to try to agree on a purchase price and, if they cannot, up to ten business days to try to agree on an appraiser.  All of this makes clear that "[u]pon" in Section 8.2 does not mean "on" a specific date—just as "upon" in Section 7.2(c) obviously does not mean "on" a specific date.

The phrase "[u]pon the occurrence of an Option Event" in Section 8.2 serves the same purpose as the phrase "[i]n the event a Qualified Member terminates his or her employment" in Section 7.2 and the phrase "[u]pon termination of employment" in Section 7.2(c):  All three phrases identify events that *trigger* the purchase or valuation process.  None of the phrases identify either the date on which the appraisers must actually perform their work or the date as of which the member's interest must be valuated.

Of course, as Northway conceded at oral argument, the date of the Option Event would be *a* reasonable valuation date, especially given the lack of any obvious alternative.  But that result is not compelled by the language of the MCA.  It is just as likely that the parties simply failed to agree on a valuation date.  Because there are at least two reasonable interpretations of the MCA—(1) the valuation date is the date of Steffen's termination and (2) the parties did not agree on a valuation date—the MCA is ambiguous.

## 2.  Extrinsic Evidence

Unlike Steffen, Northway concedes that the MCA is ambiguous.  But Northway argues that the extrinsic evidence proves beyond reasonable dispute that the valuation date is December 31, 2018.  ECF No. 30 at 14–16.  The specific extrinsic evidence to

which Northway points is (1) "historical practice," *id.* at 14, and (2) communications

made in the course of negotiations between Steffen and Northway, *id.* at 14–15.

*a.  Historical Practice*

As to historical practice:  Northway cites the testimony of the chief financial

officer of the four companies making up the practice that "every member of Northway,

including [Steffen], bought into the Practice using share prices determined as of

December 31 of the previous year."  ECF No. 34 ¶ 1–2.  But it is not apparent why this

buy-*in* practice is relevant to determining the valuation date for Northway's buy-*out* of

a member's interest.

Northway also cites evidence that, while Steffen was a member of Northway,

four doctors left the practice (with varying degrees of acrimony).  *Id.* ¶¶ 3–6.  Their

shares were all valued as of December 31 of the year before their termination (excepting

one retiring member, who agreed to split his buyout into two parts).  *Id.*  But, as

Northway admitted at oral argument, none of these doctors contested their valuation

dates (not even the departing doctor who was "litigious").  In other words, there is no

evidence that the parties gave any thought to the issue.  That weakens the probative

value of this evidence.[9]

_____

[9]Further, the valuation dates for the repurchases in those four cases were not the same as their effective dates, ECF No. 34 ¶¶ 3–6, which is contrary to what Northway claims is the case for Steffen, ECF No. 30 at 12.

At best, historical practice provides only modest support for Northway's position.

### b. Parties' Negotiations

Northway also relies on statements made (or not made) by Steffen's attorneys during negotiations with Northway's attorneys.  Steffen's previous counsel sent Northway's counsel two letters in June 2018.  The first, dated June 14, asserted that, "under the various Redemption Agreements, Dr. Steffen's buy-out should be calculated based on a termination date after June 30, 2018 and thus should use December 31, 2018, valuation numbers and not December 31, 2017, valuation numbers . . . ."  ECF No. 36-1 at 97.  That letter goes on to suggest that Steffen may be amenable to a December 31, 2017, valuation date if that would result in a higher price than would a December 31, 2018, valuation date; the letter asks Northway's counsel to send calculations using both the actual December 31, 2017, numbers and the projected December 31, 2018, numbers. *See id*.  The second letter, dated June 18, responds to calculations that Northway's counsel had supplied after receiving the June 14 letter.  *Id.* at 99.

Northway also relies upon two letters that it sent to Steffen in early 2019.  ECF No. 30 at 14–15.  One letter, dated January 4, 2019, proposes (among other things) to value the Woodlake building the same as its value on December 31, 2017, and to send Steffen his share of the distribution from the sale of the Beam building.  ECF No. 37 at

5–6.  The other letter, dated January 8, 2019, is a reply to Steffen's response to the

January 4 letter.  *Id.* at 8–9.  Northway points out that Steffen did not *disagree* with the

December 31, 2017, valuation date that it proposed.

Like the historical-practice evidence, these letters provide only limited support

for establishing a December 31, 2018, valuation date under the MCA.  The June 2018

letters explicitly discuss the valuation dates under the *Redemption Agreements*, not *the

MCA*.  ECF No. 36-1 at 97.  It is thus not clear whether those letters even refer to the

Northway valuation date.  And the January 2019 letters have little (if any) probative

value; there is simply not much to connect those letters with Northway's proposed date

of December 31, 2018.  In fact, the only valuation date mentioned in either of the

January letters is the date of December 31, *2017*—and that is for the Woodlake building,

not the Beam building.

The letters have another problem.  On summary judgment, the Court may

consider only admissible evidence.  Fed. R. Civ. P. 56(c); *Lipp v. Cargill Meat Sols. Corp.*,

911 F.3d 537, 544 n.6 (8th Cir. 2018).  The statements in these letters are not admissible.

Evidence of "a statement made during compromise negotiations about [a disputed]

claim" is "not admissible—on behalf of any party—either to prove or disprove the

validity or amount of [that] disputed claim or to impeach by a prior inconsistent

statement or a contradiction."  Fed. R. Evid. 408(a), (a)(2).

-22-

Rule 408 applies only to "compromise evidence relating to a 'claim' that was disputed when the settlement negotiations . . . took place." *Weems v. Tyson Foods, Inc.*, 665 F.3d 958, 965 (8th Cir. 2011). But "a dispute need not 'crystallize to the point of threatened litigation' for the 408 exclusion rule to apply." *Id.* (quoting *Affiliated Mfrs., Inc. v. Aluminum Co. of Am.*, 56 F.3d 521, 527 (3d Cir. 1995)). Rather, a dispute exists if "there is 'an actual dispute or difference of opinion' regarding a party's liability for or the amount of the claim." *Id.* (quoting *Affiliated Mfrs.*, 56 F.3d at 527). For example, in *Weems* (an employment-discrimination case), the Eighth Circuit found that the trial court had committed reversible error in admitting into evidence a proposed separation agreement that the defendant employer had sent to the plaintiff employee after she was removed from her position and after she expressed concerns about her removal to a human-resources officer. *Id.* at 963, 965–66. The Eighth Circuit held that Rule 408 barred admission of the proposed agreement even though the employee had not threatened or even "contemplat[ed] legal action at the time." *Id.* at 965.

Here, when the letters between Steffen's counsel and Northway's counsel were sent, there was a clear disagreement between the parties about how much Steffen's interest in the overall practice was worth. The letters themselves provide evidence of that disagreement. *See* ECF No. 36-1 at 97, 99; ECF No. 37 at 6, 9. Thus, there was a

claim in dispute for purposes of Rule 408.  And all of the letters were sent in the course of negotiations regarding that disputed claim.[10]

Northway contends that Rule 408 does not bar the June 14, 2018, letter because the letter "does not offer to compromise on the disputes in this litigation."  ECF No. 48 at 5 n.2.  Northway says that the letter predates Steffen's litigation in state court and was sent nearly two years before Steffen first told Northway that he disputed the valuation date for the Northway buyout.  *Id.*

But a court applying Rule 408 does not slice litigation so finely.  Rule 408 is intended to promote "the public policy favoring the compromise and settlement of disputes."  *Weems*, 665 F.3d at 965 (quoting Fed. R. Evid. 408 advisory committee's note (1972)).  And a court must apply Rule 408 "in light of its underlying purpose."  *Id.* Settlement negotiations would be chilled if courts broke those negotiations into fragments and insisted that each fragment directly relate to an actually disputed issue in order for Rule 408 to apply.  Parties would be discouraged from taking any position on any issue—even issues that they do not (yet) consider to be in dispute—lest they be

---

[10]*See* ECF No. 36-1 at 97 (indicating a willingness to consider December 31, 2017, as a valuation date and an earlier termination date in exchange for the practice's waiver of any overdraw by Steffen); *id.* at 99 ("Accordingly, the Company proposes to repurchase Dr. Steffen's Membership Interest in the Company for $565,635."); ECF No. 37 at 6 ("If this proposal is acceptable to Dr. Steffen, it will resolve the repurchase of his interest in [Northway]."); *id.* at 9 ("Nevertheless, the Company still believes that this transaction in particular should be relatively straight-forward and the parties should be able to reach agreement on price.").

-24-

stuck with those positions in later litigation. *See id.* at 967 ("It would be unreasonable to expect a party to ever make a settlement offer if doing so forced it into choosing between conceding one or more elements of liability or damages or having the offer admitted against it." (quoting *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 798–99 (6th Cir. 2007))); *see also* 2 McCormick on Evidence § 266 (Robert P. Mosteller et al. eds., 8th ed. 2020).

To summarize:  The admissible extrinsic evidence of historical practice provides modest support for the contention that the MCA's valuation date is December 31 of some year (not necessarily 2018).  But that evidence does not compel a finding that the valuation date is December 31, 2018.  A reasonable factfinder could also conclude that there was simply no agreement between the parties regarding the valuation date.  This issue will have to be tried.[11]

---

[11]Although the parties' briefs do not discuss the canon of *contra proferentem*—the rule that an ambiguous contract should be construed against its drafter—the topic did come up at oral argument.  In Minnesota, the canon is applied "only *after* an attempt is made to determine the parties' intent behind an ambiguous term, using extrinsic evidence if available." *Staffing Specifix*, 913 N.W.2d at 693–94; *see also id.* at 693 n.4. Because the canon comes into play only after extrinsic evidence is admitted, the trier of fact is usually the one to apply it.  *See id.* at 694.

*D.  Forfeiture*

Finally, Steffen asks the Court to find Northway in breach of the MCA because Northway has neither completed an independent appraisal nor repurchased his interest within what he asserts are the MCA's required time frames.  ECF No. 41 at 9–12. Although Steffen alleges in his amended complaint that he suffered damages from a breach of contract, ECF No. 5 at 8 ¶ 42, he does not identify in his opening brief how he was damaged by any such breach.  Instead, he now appears to seek only declaratory relief on his breach-of-contract claim, asking the Court to declare that, in light of Northway's breach, Steffen's membership interest must be "valued by using the valuation completed by his independent appraiser."  ECF No. 41 at 18.

The parties agree that, after the time periods expire for mutually agreeing on a purchase price or on an appraiser, the MCA does not specify a date by which the parties must each select an independent appraiser.  ECF No. 30 at 17; ECF No. 41 at 11; ECF No. 5-1 at 13.  But Steffen points out that the MCA required Northway to purchase his interest within three years after he left the practice.  Working backward from that deadline, Steffen argues that the MCA implicitly requires the parties to submit appraisals "in time to value the membership interest[] and complete the buy-out by the three-year deadline" (which was August 5, 2021).  ECF No. 41 at 11.  Thus, Steffen says, Northway breached the MCA because it did not obtain an appraisal in time.  *Id.*

-26-

Likewise, Steffen argues that Northway's failure to buy back his interest by August 5, 2021, is a separate breach of the MCA.  *Id.* at 11–12.

The problem with Steffen's argument is that the parties dispute the valuation date.  Until that dispute is resolved, neither party can know for certain what its appraiser is supposed to appraise.  Under Minnesota law, "performance is excused when it is hindered or rendered impossible by the other party."  *Societe Generale Immobiliere v. Minneapolis Cmty. Dev. Agency*, 44 F.3d 629, 638 (8th Cir. 1994).  If it turns out that Northway is correct that the MCA sets a valuation date of December 31, 2018, then *Steffen's* refusal to participate in the appraisal process for that date may have hindered Northway's ability to perform, thereby excusing its performance.  Thus, at least until the valuation-date question is resolved, there is a genuine dispute of material fact as to whether Northway has breached the MCA.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.      The motion of defendant/counterclaimant Northway Resource Development, LLC ("Northway"), for summary judgment [ECF No. 28] is DENIED.

2.      The motion of plaintiff/counterdefendant Dr. Eric Steffen for summary

judgment [ECF No. 39] is GRANTED IN PART and DENIED IN PART as

follows:

      a.      The motion is GRANTED IN PART as to Steffen's declaratory

           claim.  The Court DECLARES that, under the Member Control

           Agreement, the effective date of Northway's purchase of Steffen's

           membership interest in Northway is the closing date of that

           transaction.

      b.      The motion is DENIED in all other respects.

Dated:  January 26, 2022                  s/Patrick J. Schiltz_____
                                            Patrick J. Schiltz
                                            United States District Judge